NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SAPULPA TYPOGRAPHICAL UNION
NO. 619, Affiliated with International
Typographical Union, Respondent.

No. 7221.

United States Court of Appeals
Tenth Circuit.

Aug. 28, 1963.

Rehearing Denied Oct. 2, 1963.

Lee Modjeska, Atty., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, As- soc. Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, and James C. Paras, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

George Kaufmann, Washington, D. C. (Gerhard P. Van Arkel, Washington, D. C., on the brief), for respondent.

Before PHILLIPS, PICKETT and SETH, Circuit Judges.

PICKETT, Circuit Judge.

In this proceeding the National Labor Relations Board seeks enforcement of its order requiring the respondent union to cease and desist from picketing the Sapulpa Daily Herald, a newspaper published in Sapulpa, Oklahoma.[1] The union agrees that the object of the original picketing was to force or require the employer to recognize and bargain with the union as representative of the employees, and that it did not file a petition for election or representation under Section 9(c) of the Labor Relations Act. The issues presented relate to the Board's determination that the union picketed the employer's business without filing a representation petition within a reasonable period of time after the picketing began, as required by Section 8(b) (7) (C) of the 1959 Amendments to the Act.[2]

1. The Sapulpa Daily Herald is owned by a partnership composed of Ed K. Livermore and his wife, Melba H. Livermore.

2. Effective November 13, 1959, 29 U.S.C.A. § 158 was amended to defined additional "unfair labor practices." Section 8(b) (7), a new provision in Section 8 of the Act, provides that it shall be an unfair labor practice for a labor organization "to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

"(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c) (1) of this title or in the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

The essential facts are not in dispute. The employer published a daily newspaper in Sapulpa, Oklahoma, and used 6 employees in its composing room, some of whom were members of the respondent union. Early in the year 1959, although not certified as their bargaining agent, union representatives demanded that the employer enter into bargaining with the union for the purpose of negotiating a contract for these 6 employees. It presented a contract to be signed by the employer which provided that the union was to be recognized as the exclusive bargaining representative of the employees. After several unsuccessful meetings the employer questioned the right of the union to represent the employees and thereafter suggested that they join in petitioning the Board for a representation election, and stated that if the union was certified as the exclusive bargaining agent then bargaining would be appropriate. The union representatives did not contend that it represented a majority of the employees, but threatened to picket the newspaper if the employer refused to recognize the union as the exclusive collective bargaining agent of the employees.[3]

On October 5, 1959, orderly and peaceful picketing began, and continued until enjoined on December 7, 1959. Prior to December 1 the picket signs read "Sapulpa Herald unfair to I.T.U. Local 619." These signs were changed on December 1 to read "Informational Picketing Sapulpa Herald does not employ members of Typographical Union No. 619." On November 19, 1959 an unfair labor practice charge was filed alleging that the union's picketing violated Section 8(b) (7) (C) of the Act, which became effective on November 13, 1959. The trial examiner who heard the complaint issued on the charge found that the pick-

eting from the effective date of the statute until December 7, 1959 was more than reasonable time to file the petition within the statutory meaning. The Board accepted the examiner's finding, but found it unnecessary to pass upon the purpose of the picketing after the picket signs were changed on December 1st, stating that, "the 18 days of picketing between November 13, 1959 and * * * December 1, 1959, * * * was a 'reasonable period of time' within the meaning of * * * [Section 8(b) (7) (C)], in view of the duration of the picketing before November 13, 1959."

■■ The union urges that the matter was heard before the examiner upon the theory that reasonable time was to be tested by considering the entire period of picketing after November 13. It argues that when the Board based its finding of reasonableness on a shorter period, there was a prejudicial shift in the Board's theory of a reasonable standard from that presented and considered at the hearing, and deprived the union of an opportunity to properly defend. There is no merit to this position. The findings by the Board that a time shorter than that advocated by the general counsel and considered by the examiner could not prejudice the union. It contended throughout that there was no unlawful picketing after December 1st, when the picket signs were changed, and that the question of reasonable time must be determined as of the period from November 13 to December 1. It had been picketing the employer with the object of requiring its recognition for a period of 40 days prior to the date when the statute became effective, and it continued picketing for this purpose for 18 days thereafter before the picket signs were changed. The picketing pri-

"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection."

3. There was evidence to the effect that at meetings between union representatives and the employer, the union admitted that it did not represent a majority of the employees at that time and could not win an election, and that the union would rely upon those employees who refused to cross the picket line in determining whether they represented the majority.

or to November 13 is only a circumstance which the Board might consider, along with all the other evidence in the case, in determining the reasonable time in which the representation petition should have been filed by the union to protect itself against an unfair labor practice charge. N. L. R. B. v. Local 239, International Brotherhood of Teamsters, etc., 2 Cir., 289 F.2d 41, cert. denied 368 U.S. 833, 82 S.Ct. 58, 7 L.Ed.2d 35. The union's position before the trial examiner was that the 18 days of picketing after November 13 was not a reasonable time within which to file an election petition. Although the examiner did not make a finding on this period, the Board is free to do so when the examiner's report is considered. The trial examiner is the agent of the Board and makes only recommendations in his report of proceedings which he has conducted. Although the Board should give weight to the recommendations and findings of the examiner, it is not bound by them and may make its own findings from the record. 31 Am.Jur., Labor § 297; Administrative Procedure Act, § 8(a), 60 Stat. 242, 5 U.S.C. § 1007(a); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Eclipse Lumber Co., 9 Cir., 199 F.2d 684, 36 A.L.R.2d 625.

 The manifest purpose of Section 8(b) (7) (C) is to limit picketing for representative or organizational purposes and provide for expeditious representation elections. Department & Specialty Store Employees' Union Local No. 1265, etc. v. Brown, 9 Cir., 284 F.2d 619, cert. denied 366 U.S. 934, 81 S.Ct. 1659, 6 L.Ed.2d 846. The unambiguous statutory language declares that picketing for such purposes is an unfair labor practice unless a petition for a representation election is filed with the Board within a reasonable time after the picketing commences. The maximum statutory reasonable time is 30 days. It may be less. In other words, the statute permits picketing only for a reasonable time in an attempt to secure union representation or recognition, but never for more than 30 days.[4] The statute does not provide specific standards for the measurement of a "reasonable period", but delegates to the Board authority to make that determination in the light of the facts presented in each case. The Board's finding that the 18 days of picketing after the effective date of Section 8(b) (7) (C) was a reasonable time within which to file a petition for a representation election is amply supported by the record.

 The union argues that the statute must be construed as giving the right to engage in recognitional or organizational picketing for a period of 30 days before filing the required election petition, and that picketing before the effective date of the statute may not be considered in computing the required number of days. We have already said that the Board may determine the statutory period to be less than 30 days. We agree, however, that in making that determination the Board is confined to the picketing activity after the effective date of the statute. The dispute arose before this date and there was no change in the picketing until December 1, 1959. This does not prevent the application of the statute after it became effective. Local 74, United Brotherhood of Carpenters, etc. v. N. L. R. B., 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309; Jeffery-De Witt Insulator Co. v. N. L. R. B., 4 Cir., 91 F.2d 134, 112 A.L.R. 948. Although the Board gave consideration to the prior picketing as a circumstance which might affect its findings as to what was a reasonable time to act after November 13, its determination was limited to the union's picketing activities after that date.

---

4. Representative Griffin, co-sponsor of this provision, and a member of the Conference Committee which drafted the final bill, said: "Of course, the picketing may be enjoined in less than 30 days if the Board finds the circumstances are such as to make it unreasonable to permit it to continue and it must be stopped at the end of 30 days." (105 Cong.Record, 18153; II Legis.History 1812).

Consequently, Section 707 of the 1959 Act had no application in this instance.[5]

 The union contends that if the statute is construed to permit a period of less than 30 days to be a reasonable time for the filing of a 9(c) petition, there is no standard by which it may determine when filing is required, and, therefore, is constitutionally defective because of vagueness and indefiniteness. The answer to this contention is found in N. L. R. B. v. Local 239, International Brotherhood of Teamsters, etc., supra, 289 F.2d at 44–45, where the court said:

> "The union suggests that a 'reasonable period of time not to exceed thirty days' must be read to mean 'thirty days' in the absence of 'unusual compelling and extenuating circumstances,' lest it be in danger of being so vague as to violate due process or constitute an unconstitutional delegation to the Board of legislative power. The statute plainly contemplates thirty days as the outer limit, with power in the Board, subject to review by the courts, to fix shorter periods as 'reasonable' ones according to particular fact situations. See Comment, 69 Yale L.J. 1393, 1424; 105 Cong. Rec. 18153 (remarks by Mr. Griffin). And as so construed, the constitutionality of this clause stands unimpaired. The standard of 'reasonableness,' employed daily by judges and administrators in countless rules of decision, is sufficient to shield authority granted an administrative agency from constitutional attack, just as is, for example, the standard of 'the public interest,' see New York Central Sec[urities]

Corp. v. United States, 287 U.S. 12, 24, 53 S.Ct. 45, 77 L.Ed. 138; McManus v. C. A. B., 2 Cir., 286 F.2d 414."

Enforcement granted.

---

5. Section 707, 73 Stat. 546, provides:
 "The amendments made by this title shall take effect sixty days after the date of the enactment of this Act and no provision of this title shall be deemed to make an unfair labor practice, any act which is performed prior to such effective date which did not constitute an unfair labor practice prior thereto."